*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0325P (6th Cir.)
File Name: 00a0325p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

MICHAEL MONTGOMERY,
Administrator ad litem of the
Estate of Mary L. Nave,
　　　　*Plaintiff-Appellant/*
　　　　*Cross-Appellee,*

　　　　*v.*

CARTER COUNTY,
TENNESSEE, JACK PERKINS,
Highway Superintendent,
Carter County, Tennessee,
CARTER COUNTY
COMMISSION, DEAN PERRY, et
al., Carter County
Commissioners in their
individual and official
capacities,
　　　　*Defendants-Appellees/*
　　　　*Cross-Appellants,*

LUTHER JEAN HASSELL, a/k/a
Jean W. Hassell,
　　　　*Defendant.*

Nos. 98-6403/6440

1

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 96-00509—Thomas G. Hull, District Judge.

Argued:  August 9, 2000

Decided and Filed:  September 18, 2000

Before:  COLE and GILMAN, Circuit Judges; TARNOW,
District Judge.

_____

**COUNSEL**

**ARGUED:**   Kathy Montgomery, Houston, Texas, for
Appellant. William R. Berry, MOORE, STOUT, WADDELL
& LEDFORD, P.C., Kingsport, Tennessee, for Appellees.
**ON BRIEF:**   Kathy Montgomery, Houston, Texas, for
Appellant.  J. Patrick Ledford, William R. Berry, MOORE,
STOUT, WADDELL & LEDFORD, P.C., Kingsport,
Tennessee, for Appellees.

_____

**OPINION**
_____

   RONALD LEE GILMAN, Circuit Judge.  This case, which
has been in federal court since 1996, arises from a dispute
over the ownership of an eleven-foot wide strip of asphalt in
Carter County, Tennessee.  The plaintiff, the Estate of Mary
Nave, contends that the strip is nothing more than the
driveway to the decedent's rural residence.  As far as Carter
County is concerned, however, the contested stretch of asphalt
is a county road and must remain a county road until the

_____

   *The Honorable Arthur J. Tarnow, United States District Judge for
the Eastern District of Michigan, sitting by designation.

Tennessee state courts declare otherwise.  Disagreeing, Mary Nave brought suit in the United States District Court for the Eastern District of Tennessee pursuant to 42 U.S.C. § 1983, alleging that Carter County's refusal to abandon its claim to the driveway constitutes an unconstitutional taking of private property for a private use.  Named as defendants were Carter County, the Carter County Commission, various county officials in both their individual and official capacities (collectively, the county defendants), and Mary Nave's next-door neighbor, Luther Jean Hassell.

The district court denied the county defendants' motion for summary judgment, but nevertheless dismissed Mary Nave's claims against them, concluding that her claims against the county defendants were not ripe for adjudication under the rule announced in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985).  Mary Nave's estate has appealed the dismissal, and the county defendants have cross-appealed the district court's denial of their motion for summary judgment based both on qualified immunity and the alleged running of the statute of limitations.  In addition, Mary Nave's estate has moved to dismiss the county defendants' cross-appeal as untimely filed. For the reasons set forth below, we **DENY** the estate's motion to dismiss the county defendants' cross-appeal as untimely, **REVERSE** the judgment of the district court to the extent that it dismissed the claims of Mary Nave's estate as premature, **AFFIRM** the judgment of the district court to the extent that it denied the county defendants' motion for summary judgment, and **REMAND** this case to the district court for further proceedings.

## I.  BACKGROUND

The residence of the late Queen Nave is located in Carter County, Tennessee.  He (that is the correct pronoun) built a private driveway on his property between Siam Road, a public thoroughfare, and his garage many years ago.  The driveway is slightly more than one-tenth of a mile long and is roughly

eleven feet wide. Carter County road crews have pushed snow off of the driveway on several occasions and even paved it once in the early 1960s. The Nave family insists that the only reason why a county road crew paved the driveway was because the crew had a large amount of leftover asphalt after paving a nearby public road and received Queen Nave's permission to get rid of the excess asphalt by laying it down on the then-unpaved driveway.

But Queen Nave otherwise maintained the driveway. In 1977, for example, he replaced one of the driveway's two bridges after a flood destroyed it. Federal disaster-relief funds were distributed in Carter County after the flood. Queen Nave and his daughter, Shirley Montgomery, asked the then-serving county road superintendent about the possibility of obtaining federal funds in order to defray the cost of repairing the bridge, but were told that federal funds could only be used to repair county roads and bridges. The Naves were not eligible for federal disaster-relief funds, the road superintendent explained, because Queen Nave's bridge was a private bridge located on private property. In 1969, when Queen Nave's health was failing, his congressman submitted a postal petition on his behalf that resulted in the Postal Service delivering mail directly to his residence—which involved using the driveway—rather than to a mailbox on Siam Road. The postal petition was necessary because the driveway was considered to be private property.

After Queen Nave's death, the driveway was maintained by Nave family members, friends of the family, and persons hired by Mary Nave, Queen Nave's widow. Mary Nave lived on the property until her death in 1998. Ownership of the property has now passed to the Estate of Mary Nave.

No one else's property abuts the driveway. The driveway, however, is located very close to the property line separating the Naves' land from that owned by Luther Jean Hassell. Hassell's property has frontage on Siam Road, just as the Naves' property does. Nevertheless, since about 1980,

But the question of whether any other person used the driveway appears to have nothing to do with the question of whether the Naves own it or Carter County owns it. Hassell may indeed have a dispute with the Naves over whether she has the right to use the driveway, but that is a very different dispute than the one the county defendants have created.

The answer to whether or not Carter County owns the driveway should be found in its archives. If Carter County has no record of Queen Nave Road existing before it first appeared on the county's list of roads in 1995, and there is no record of the driveway's sale, grant, or dedication to the county, then we are at a loss to understand why the absence of documentation should not be conclusive. Why the county defendants thought that they needed to hear from Hassell in order to determine whether Carter County owns the driveway is unclear. Regardless of the outcome of any dispute between Hassell and the Naves over the use of the driveway, it would not follow that the Naves would have to tolerate the use of their driveway by other uninvited members of the general public, and it certainly would not follow that the driveway is the county's property.

### III. CONCLUSION

For all of the reasons set forth above, we **DENY** the estate's motion to dismiss the county defendants' cross-appeal as untimely, **REVERSE** the judgment of the district court to the extent that it dismissed the claims of Mary Nave's estate as premature, **AFFIRM** the judgment of the district court to the extent that it denied the county defendants's motion for summary judgment, and **REMAND** this case to the district court for further proceedings consistent with this opinion.

On August 4, 1995, counsel for Carter County informed Kathy Montgomery that not only was Carter County going to correct the problem administratively, but that it had already done so by removing Queen Nave Road from the list of county roads. By letter dated October 16, 1995, counsel for Carter County advised the postmaster that Carter County had changed its position and was now of the opinion that the Naves' driveway was a county road after all. The letter contains a notation that a copy was being sent to Kathy Montgomery. There is, however, no evidence of record regarding when (or even whether) this copy was received. The complaint in this case was filed on October 16, 1996, which is exactly one year from the date of the letter by Carter County's counsel to the postmaster.

In its briefs, the county defendants fail to discuss the doctrine of equitable estoppel or the relevance, if any, of Carter County's assurances to Kathy Montgomery in 1995 that the county road list had been administratively corrected. In the absence of any such argument, we agree with the district court that the extent to which the county defendants may rely on the statute of limitations defense cannot conclusively be determined from the record in its present state. The county defendants are therefore not entitled to summary judgment on the basis of the statute of limitations.

### G.  The cross-appeal—Hassell's interest

It is difficult to avoid the conclusion that the costs of this litigation are being compounded out of all proportion to the stakes involved. Even more disturbing, nearly four years after the complaint in this case was filed, the county defendants appear to misapprehend the role of Mary Nave's neighbor in this dispute. In their opening brief, the county defendants make much of the fact that when Shirley Montgomery asked the Carter County Highway Committee to take her mother's driveway off the county's list of roads, she "did not explain . . . that any other person [i.e., Hassell] made use of" the driveway.

Hassell has occasionally used the driveway that Queen Nave built rather than using her own unpaved driveway in order to get to and from Siam Road. While delivering the Naves' mail along the paved driveway, the Postal Service would also deliver Hassell's mail directly to her house as well.

In June of 1995, the Carter County Commission adopted an official county road list. On the list, the driveway was described as a county road named Queen Nave Road. How the driveway came to be designated as a county road is a mystery. There is no suggestion that the driveway was ever dedicated, granted, or otherwise given to Carter County. In fact, Carter County concedes that the listing of the driveway as a county road was, in all probability, simply a clerical error.

Mary Nave's daughter, Shirley Montgomery, who handled routine business matters for her mother, first found out about the designation when she asked Hassell to stop cutting across the Naves' paved driveway in order to get to and from Siam Road. Hassell responded by telling Shirley Montgomery that the paved driveway was a county road and, consequently, that the Naves could not stop her from using it. Shirley Montgomery then met with Jack Perkins, the Carter County Road Superintendent, on her mother's behalf. Perkins advised her that the driveway was listed on the county road map and the official county road list as Queen Nave Road, a county road. Although Perkins conceded that Carter County had no records of ever performing maintenance on Queen Nave Road, and that he had no idea how it came to be listed as a county road in the first place, he said that there was nothing he could do about it because Queen Nave Road was on the official county road list as adopted by the Carter County Commission.

At this meeting, Shirley Montgomery explained that Mary Nave had been the victim of two attempted robberies (one of which succeeded) in her home, and that she wanted to erect a fence and a gate on the driveway. Perkins replied that this would be illegal because Tennessee law prohibits the

obstruction of public roads and that, because Queen Nave Road was listed in Carter County's official register as a county road, the driveway was a public road as far as Carter County was concerned. In addition, at an unspecified time, Mary Nave had part of the driveway excavated so that an underground water pipe could be repaired. Shirley Montgomery was advised by Jim Slemp, an official of the Carter County Road Department, that the digging violated state law because it was an obstruction of a public road, and that the "road" had to be repaired at the Naves' expense.

On July 14, 1995, Shirley Montgomery appeared before the Carter County Highway Committee on her mother's behalf, asking that the driveway be removed from the county road list and county road map. She took Highway Superintendent Perkins and several members of the Highway Committee to see the driveway for themselves, pointing out that no one besides Mary Nave and her tenant lived along the driveway, and that Hassell had her own dirt driveway and did not need to use the Naves' driveway in order to get to and from her house. On July 17, 1995, Shirley Montgomery appeared before the Carter County Commission, again asking that Carter County abandon its designation of Mary Nave's driveway as Queen Nave Road. The Carter County Commission voted to refer the matter to the Highway Committee and the county attorney for a recommendation.

Also on July 17, 1995, Kathy Montgomery, Mary Nave's attorney (and granddaughter), contacted the county attorney both by telephone and letter, requesting that the county road list be administratively corrected by removing Queen Nave Road from the list. In the letter, Kathy Montgomery stated that the Naves had owned the property for over one hundred and fifty years, that the driveway was part of the property, and that a full title search had revealed that the Naves had never conveyed the driveway to Carter County or anyone else. Three days later, the county attorney wrote Highway Superintendent Perkins, advising him that it appeared from Kathy Montgomery's letter that Carter County had

have not done so yet. Their only asserted justification so far boils down to an argument that even if they knew that the listing of the driveway as a county road was a mistake, Mary Nave's neighbor finds it convenient to use the driveway, so Carter County will refuse to let go of the driveway until the representatives of Mary Nave's estate jump through what the county defendants deem to be the proper remedial hoops.

For the reasons stated above, however, if the taking was for a private use, then Mary Nave's estate is not required to seek inverse condemnation or obtain a declaratory judgment quieting title to the driveway. And the estate is clearly not required to file a road closure petition pursuant to TENN. CODE ANN. § 54-10-20 as the county defendants have suggested. That section deals with the closure of public roads, which presupposes that the road is the public's to close, and presumably would leave Carter County holding title to the driveway in question.

### F. The cross-appeal—statute of limitations

Finally, the county defendants argue that Mary Nave's claims are barred by the statute of limitations. In Tennessee, the statute of limitations for actions pursuant to 42 U.S.C. § 1983 is one year. *See, e.g.*, *Jackson v. United States*, 24 F. Supp. 2d 823, 829 (W.D. Tenn. 1998). Under Tennessee law, the limitations period begins to run "when the plaintiff knows, or in the exercise of reasonable care and diligence should know, that an injury has been sustained." *Wyatt v. A-Best, Co.*, 910 S.W.2d 851, 854 (Tenn. 1995). Tennessee law also recognizes the doctrine of equitable estoppel. *See Sparks v. Metropolitan Gov't of Nashville & Davidson County*, 771 S.W.2d 430, 433 (Tenn. Ct. App. 1989). Under that doctrine, a defendant may be equitably barred from relying on the statute of limitations defense if the defendant has caused the plaintiff to reasonably believe that the defendant "is going to pay a claim or otherwise satisfy the [plaintiff's] claims," and in reliance the plaintiff fails to file his complaint within the limitations period. *Id*. at 433.

### E. The cross-appeal—private taking

The county defendants are, of course, correct when they point out that a taking need not benefit a large number of people in order for the taking to be considered one for a public purpose. *See Rindge Co. v. County of Los Angeles*, 262 U.S. 700, 707 (1923) ("It is not essential that the entire community, nor even any considerable portion, should directly enjoy or participate in an improvement in order to constitute a public use."). Their argument, however, proves too much. If a taking had to be considered one for a public use simply by virtue of the fact that it benefits at least one other person (i.e., Hassell), there would be little left to the prohibition against private-use takings.

The county defendants' assertion that "the only conceivable way Carter County could attempt a 'private' taking would be to condemn Queen Nave Road for . . . Hassell's exclusive use and then somehow use the county's authority to exclude others from using the road" is unsupported by any authority and clearly meritless. As noted above, one of the most important incidents of private ownership of property is the right to exclude others. The county defendants' refusal to abandon Carter County's claim of ownership to the driveway has totally stripped Mary Nave's estate of that property interest. As things now stand, the Naves must tolerate not only Hassell's presence on the driveway, but also the presence of any other member of the general public. The county defendants' argument that they might have violated *Hassell's* substantive due process rights if they had not "maintain[ed] the status quo" by reasserting county ownership is equally unavailing. Not surprisingly, they do not mention what "substantive due process" rights of Hassell's they are referring to.

As previously stated, the standard for demonstrating a taking to be one for a public use is an extremely low one, and it is not completely outside the range of possibility that the county defendants will meet this standard at trial. But they

erroneously listed the Naves' private driveway as a county road on its official road map and road list, and that the driveway should be removed from both. A copy of the letter was sent to Kathy Montgomery.

On August 3, 1995, Kathy Montgomery wrote back to the county attorney, thanking him for his attention and requesting that she be notified once the administrative correction became official. The next day, the county attorney responded, informing Kathy Montgomery in a short letter that "the administrative correction in removing the driveway from the county road list and map was made on July 27, 1995." Soon afterward, Mary Nave, or a family member on her behalf, contacted the postmaster to request that the mail carrier stop delivering mail to her house.

Whether the administrative correction was ever actually made is not clear. In any event, it appears that Hassell, the Naves' neighbor, became upset when the Postal Service stopped delivering mail directly to Mary Nave's house, because it also stopped delivering mail directly to Hassell's house. This led Hassell to appear before the Carter County Commission on October 16, 1995 to request that the administrative correction be rescinded, and that the driveway continue to be designated as a public road. The Carter County Commission then approved a resolution to direct the county attorney to write the postmaster, advising that "a mistake had been made and . . . the road known as Queen Nave Road is a county road until proven different," and requesting that mail service "be restored to the residents on that road."

This caused Mary Nave to initiate the present suit. She asserted claims against the county defendants under the Fifth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983, and a state-law claim against Hassell for common-law fraud. Several other claims were also raised in the complaint, but none of them are at issue in this appeal and cross-appeal.

The county defendants moved for summary judgment, asserting that (1) Mary Nave's estate had failed to produce evidence that would support cognizable Fifth or Fourteenth Amendment claims, (2) the claims were time-barred, and (3) all of the county defendants were entitled to qualified immunity. Rejecting each of these arguments, the district court denied the motion, but nevertheless dismissed the estate's claims against the county defendants after concluding that those claims were not ripe for adjudication in federal court under the rule announced in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985).

Mary Nave's estate moved for reconsideration of the dismissal, and also requested reconsideration of a ruling that the district court had made regarding the statute of limitations. Essentially, the district court had originally concluded that claims arising from Carter County's initial classification of the driveway as a county road were time-barred, but that a reasonable jury could find that Carter County later abandoned its claims to the driveway at Kathy Montgomery's urging, only to subsequently change its mind at Hassell's urging and reclassify the driveway as a county road, resulting in a second taking that would not be time-barred. On reconsideration, the district court set aside its ruling on the statute of limitations issue, concluding that further evidence might show that the statute of limitations was equitably tolled by Carter County's assurances to Kathy Montgomery in July of 1995 that the problem had been administratively corrected. The district court, however, denied reconsideration of its ruling that the claims against the county defendants were not ripe. Subsequently, the district court certified the dismissal as to the county defendants as a final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

On appeal, Mary Nave's estate argues that its claims against the county defendants are ripe for adjudication. The county defendants have cross-appealed the district court's denial of their motion for summary judgment based on qualified

clear that a reasonable official would understand that what he is doing violates that right." *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 602-03 (6th Cir. 1998) (citation and internal quotation marks omitted) (alteration in original).

An individual's right not to have her real property confiscated by governmental officials for reasons that lack any rational connection to a plausible conception of the public interest has been clearly established for a very long time. *See Citizens' Sav. & Loan Ass'n v. Topeka*, 87 U.S. (20 Wall.) 655, 663 (1875) (declaring that a statute providing that "the homestead now owned by A should no longer be his, but should henceforth be the property of B" would be invalid because of the "limitations on [government] power which grow out of the essential nature of all free governments"); *see also Madisonville Traction Co. v. St. Bernard Mining Co.*, 196 U.S. 239, 251-52 (1904) ("It is fundamental in American jurisprudence that private property cannot be taken by the government, national or state, except for purposes which are of a public character. . . .That principle, this court has said, grows out of the essential nature of all free governments.").

Moreover, it is inconceivable that reasonable public officials would not know that they are prohibited from taking privately owned real property for the sole purpose of giving the owner's neighbor the use of the property. On the basis of the summary judgment record, a reasonable trier of fact could conclude that the county defendants knew that the driveway was the property of Mary Nave and not a county road, but simply refused to give it back for a reason that has no "connection however tenuous to some at least minimally plausible conception of the public interest." *Gamble v. Eau Claire County*, 5 F.3d 285, 287 (7th Cir. 1993). We thus conclude that the county defendants were not entitled to summary judgment on the basis of qualified immunity.

11 F.3d 361, 366 (2d Cir. 1993) (exercising discretion to entertain a cross-appeal that was filed one day late). Still others have held to the contrary. *See Johnson v. Teamsters Local 559*, 102 F.3d 21, 29 (1st Cir. 1996) (concluding that the time limit is mandatory and jurisdictional); *Cyrak v. Lemon*, 919 F.2d 320, 323-24 (5th Cir.1990) (applying the timeliness requirement strictly and dismissing a cross-appeal for lack of appellate jurisdiction).

Authority in this circuit is scant, but what cases there are have generally treated the requirement as jurisdictional to the same extent as the time limit for an appellant. *See In re Interstate Agency, Inc.*, 760 F.2d 121, 122-23 & n.1 (6th Cir. 1985) (concluding that this court lacked appellate jurisdiction over a cross-appeal because it was filed one day late) ("No extra 'grace' period applies to this filing of a cross appeal.").

In any event, the county defendants' notice of cross-appeal in the present case was timely filed. Rule 4(a)(3) of the Federal Rules of Appellate Procedure provides that once a notice of appeal is filed by any party, "any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by [Rule 4], whichever period ends later." The county defendants filed their notice of appeal well within fourteen days after Mary Nave's estate filed its notice of appeal. Thus, the notice of cross-appeal was timely filed.

### D.    The cross-appeal—qualified immunity

The doctrine of qualified immunity generally shields government officials from civil liability for performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). For a defendant not to be entitled to summary judgment on the basis of qualified immunity, "[t]he contours of the right must be sufficiently

immunity and the statute of limitations. Finally, Mary Nave's estate has moved to dismiss the county defendants' cross-appeal as untimely.

### II.  ANALYSIS

### A.    Ripeness

In *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), the owner of a tract of land filed suit against the county planning commission and the commission's members in federal court, alleging that the planning commission had taken its property without just compensation in violation of the Fifth and Fourteenth Amendments. Essentially, the tract owner asserted that the planning commission had granted preliminary approval for the construction of a residential subdivision, but then effectively made building the subdivision impossible by repeatedly changing its mind in midstream about the requirements of the pertinent zoning laws and subdivision regulations, after millions of dollars had already been spent on construction.

The Supreme Court concluded that the tract owner's claim was not ripe. *See id*. at 185. First, the tract owner had not obtained a "final decision" regarding the application of the zoning ordinance and subdivision regulations to its property. The planning commission's objections might have been resolved through variances, the Supreme Court reasoned, and if the variances were granted, they would have allowed the tract owner to build as it desired and would eliminate the need for the federal courts to address the difficult and vexing constitutional questions associated with regulatory takings. *See id*. at 186-94.

Second, the Supreme Court recognized that the tract owner had not yet suffered the injury contemplated by the Fifth Amendment's takings clause because it had not yet been refused just compensation. *See id*. at 194-95 & n.14 ("The Fifth Amendment does not proscribe the taking of property;

it proscribes taking without just compensation. . . . Thus, the State's action is not 'complete' in the sense of causing a constitutional injury 'unless or until the State fails to provide an adequate postdeprivation remedy for the property loss.'") (citation omitted). Because Tennessee had an adequate procedure for pursuing inverse condemnation remedies, the tract owner was required to utilize that procedure before turning to the federal courts.

In holding that the tract owner's claim was not ripe, the Supreme Court took pains to distinguish the concept of finality from the somewhat related but distinct concept of exhaustion of state remedies. *See id*. at 192-93. The reason why the tract owner in *Williamson County* was required to pursue state remedies first was *not* so that it could obtain a judgment about whether the planning commission's actions violated its rights. That would be an exhaustion requirement. *See id.* at 193 ("While it appears that the State provides procedures by which an aggrieved property owner may seek a declaratory judgment regarding the validity of zoning and planning actions taken by county authorities, respondent would not be required to resort to those procedures before bringing its § 1983 action, because those procedures are clearly remedial.") (citation omitted). Instead, the tract owner was required to seek variances so that the planning commission could have one last chance to determine, once and for all, whether and to what extent the pertinent zoning laws and subdivision regulations allowed the tract owner to build on its property. If the planning commission decided to grant the tract owner all of the variances it needed to build as it wished, then the tract owner would have the full use of its property after all, and thus would have no takings claim (except possibly for the interim period during which the tract owner was not allowed to build). *See id*. at 194-95.

The holding of *Williamson County*, therefore, is that takings claims do not ripen in zoning cases until (1) there has been a final decision by the relevant state decisionmaker and (2) the property owner has utilized appropriate state inverse

In any event, whatever the applicability of the concepts of procedural and substantive due process to takings claims, we agree that those concepts may not be used in order to mount an end run around the ripeness requirements of *Williamson County*. Because Mary Nave's estate is complaining about a taking for a private use, however, the ripeness requirements of *Williamson County* do not apply, and we need not concern ourselves with the prospect that the estate is attempting to artfully plead as a substantive due process claim what is in fact a takings claim that is not ripe for adjudication in federal court.

## C. The cross appeal—timeliness

Rule 4(a)(1)(A) of the Federal Rules of the Appellate Procedure provides that the time for filing a notice of appeal in a civil case (subject to certain exceptions, none of which are at issue in this case) is thirty days after the date the judgment or order appealed from is entered. For appellants, it is well-established that a timely notice of appeal is a jurisdictional prerequisite for appellate review. *See United States v. Means*, 133 F.3d 444, 448 (6th Cir. 1998). There is a sharp split of authority, however, regarding whether a timely notice of cross-appeal is a jurisdictional prerequisite to review.

A number of circuits have held that notices of cross-appeals are not required, and that the failure by a cross-appellant to file *any* notice of appeal can be excused, particularly when the original appellant has been placed on notice that the opposing party wishes to alter the judgment of the district court rather than simply defend it. *See, e.g.*, *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1297-98 (9th Cir. 1999); *Coe v. County of Cook*, 162 F.3d 491, 497-98 (7th Cir. 1998) (Posner, C.J.), *cert. denied*, 526 U.S. 1040 (1999); *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 33 (D.C. Cir. 1990) (R. Ginsburg, J.). At least one other circuit has held that the requirement of a timely notice of cross-appeal is not jurisdictional. *See, e.g.*, *Texport Oil Co. v. M/V Amolyntos*,

70 (1992) (concluding that a plaintiff whose mobile home was illegally carted away with the assistance of local deputy sheriffs could state a Fourth Amendment claim in addition to a due process claim). When that occurs, "[t]he proper question is not which Amendment controls but whether either Amendment is violated." *United States v. James Daniel Good Real Property*, 510 U.S. 43, 50 (1993).

Substantive due process, however, is an exception. Because of the highly destructive potential of overextending substantive due process protection, *see, e.g.*, *Washington v. Glucksberg,* 521 U.S. 702, 720 (1997) (explaining the dangers), and because the doctrine's borders are so undefined, the Supreme Court has repeatedly cautioned that the concept of substantive due process has no place when a provision of the Constitution directly addresses the type of illegal governmental conduct alleged by the plaintiff. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 394-95 (1989) (concluding that the reasonableness or unreasonableness of force used by police during an investigatory stop or arrest must be analyzed as a Fourth Amendment claim, rather than under "the more generalized notion of 'substantive due process'").

The takings clause itself addresses whether and under what circumstances the government may take an individual's private property, which is why a number of other circuits have concluded that no room is left for the concept of substantive due process. *See, e.g.*, *Armendariz v. Penman*, 75 F.3d 1311, 1323-27 (9th Cir. 1996) (en banc) ("[S]ince the Takings Clause provides an explicit textual source of constitutional protection against private takings, the Fifth Amendment (as incorporated by the Fourteenth), not the more generalized notion of substantive due process, must be the guide in reviewing the plaintiffs' claim of a private taking.") (internal quotation marks and citations omitted); *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 464 (7th Cir. 1988) (suggesting that the negative implications of the takings clause itself, rather than the concept of substantive due process, forbid takings for solely private uses).

condemnation procedures. This latter requirement applies only if a "reasonable, certain and adequate provision for obtaining compensation," *id*. at 194 (citation and internal quotation marks omitted), exists in that state. The requirement that takings claims be ripe, however, is not the same as an exhaustion requirement. *See id*. at 192-94.

Although *Williamson County*'s requirement of pursuing available inverse condemnation remedies in state court applies generally to takings cases and not just to zoning cases, *Williamson County* does not discuss what should happen when a plaintiff files a complaint in federal court alleging that her property was taken by the government for a private use. The Fifth Amendment provides that private property shall not "be taken for public use, without just compensation," U.S. CONST. amend. V, which implies that the power of eminent domain does not permit takings of private property for strictly private uses, regardless of whether just compensation is paid. *See Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 464 (7th Cir. 1988) (suggesting that the takings clause of its own force, rather than the concept of substantive due process, forbids takings for solely private uses).

Examples of a taking for a private use tend to be "esoteric," *Gamble v. Eau Claire County*, 5 F.3d 285, 287 (7th Cir. 1993), because all that is required for the taking to be considered for public use is a rational relationship to some "conceivable public purpose." *See Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 241 (1984). Very few takings will fail to satisfy that standard. As a result, the examples suggested in the reported cases tend to be highly implausible hypotheticals. *See, e.g.*, *Gamble*, 5 F.3d at 286 (using the example of a fictional state law authorizing the governor to take a person's home and give it to his brother-in-law).

The present case presents us with a rare real-life example. This is not a zoning case in which the landowner has asserted that governmental regulation has "gone too far," *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348 (1986)

(internal quotation marks omitted), drastically reducing the value of the property even though the plaintiff retains title and physical possession. Instead, Carter County's position is that it actually owns the driveway "until proven different," which makes this case much closer to those in which the plaintiff's property has been physically occupied or invaded.

When the state has physically occupied or invaded the plaintiff's property, there is generally no need to ask the relevant state decisionmaker to clarify its final position in order to determine whether a taking has occurred. *See Kruse v. Village of Chagrin Falls*, 74 F.3d 694, 700-01 (6th Cir. 1996) (explaining why cases involving literal takings, including physical invasions or occupations, are treated differently than cases involving regulatory takings); *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 864 F.2d 1475, 1478 (9th Cir. 1989) ("A physical taking . . . is by definition a final decision, and thereby satisfies *Williamson County*'s first exhaustion requirement."), *overruled on other grounds*, *Armendariz v. Penman*, 75 F.3d 1311 (9th Cir. 1996) (en banc).

It is true that agents of Carter County are not literally occupying the driveway (obviously Carter County has not carted the driveway off and impounded it), and that members of the Nave family are allowed to drive on it. But because the driveway is classified as a county road, the Nave family now enjoys no greater right to use the driveway than any other member of the general public. The Nave family would like to put up a security gate on the driveway—hardly an irrational wish in light of the attempted robberies—but has been told that doing so would be considered an illegal obstruction of a public road, and therefore a crime. They have thus been dispossessed of the driveway under any reasonable standard. *See, e.g.*, *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd*., 527 U.S. 666, 673 (1999) ("The hallmark of a protected property interest is the right to exclude others."); *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994) (describing the right to exclude others as "one of the

"circumvent the ripeness requirement for takings claims simply by attaching a procedural due process claim to their complaint").

The justification for recognizing the denial of fair predeprivation procedures as a separate injury in takings cases is less than clear. What the Due Process clauses of the Fifth and Fourteenth Amendments protects is "life, liberty, [and] property," U.S. CONST. amends. V & XIV, § 1, not the procedures designed to protect life, liberty, and property. *See Olim v. Wakinekona,* 461 U.S. 238, 250 (1983) (noting that "[p]rocess is not an end in itself"). In takings cases, postdeprivation process is sufficient. *See Williamson County*, 473 U.S. at 195 & n.14 (observing that "the Constitution does not require pretaking compensation, and is instead satisfied by a reasonable and adequate provision for obtaining compensation after the taking").

A local governmental body, in a case involving a taking for a public use, regulatory or otherwise, has a choice: "desist or pay." *Gosnell v. City of Troy*, 59 F.3d 654, 658 (7th Cir. 1995). If the local government opts to desist, there is no taking, except possibly during the interim period. And if the local government elects to pay just compensation, there is also no illegal taking, and the landowner will receive all of the process she is due. The local government's action would be legal as far as the takings clause is concerned, regardless of whether it afforded the landowner extensive predeprivation process or no predeprivation process at all. Of course, if a landowner can prove that her land was taken for a strictly private use, "desist" or "pay" would not be an either/or proposition for the local government; it would have to do both.

Similarly, it is not clear why the concept of substantive due process should have any place in takings cases. To be sure, in other contexts, a single action or set of actions by government officials may violate more than one provision of the Constitution. *See Soldal v. Cook County*, 506 U.S. 56, 69-

estate, because it insists in its briefs that the only takings claim it is pursuing is a private-use claim, not a claim that its property was taken for a public purpose. Mary Nave's complaint is somewhat ambiguous on the subject, but for the reasons discussed above, even if it had included a just compensation claim, *Williamson County* would not require the private-use takings claim to be dismissed along with the premature just-compensation claim. Furthermore, Mary Nave's estate has made clear that it is not attempting to assert a just compensation claim.

## B.    Other constitutional claims

In addition to a Fifth Amendment takings claim, which for the reasons set forth above is ripe for judicial review, this circuit's precedents permit Mary Nave's estate to assert substantive due process and procedural due process claims as well. *See Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1215 (6th Cir. 1992) (stating that under prevailing Sixth Circuit precedent, "the very existence of an allegedly unlawful zoning action, without more, makes a substantive due process claim ripe for federal adjudication"); *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 894 (6th Cir. 1991) (concluding that "the allegedly infirm process" in a zoning case is "an injury in itself" that is "instantly cognizable in federal court without requiring a final decision on a proposed development from the responsible municipal agency") (citation omitted); *cf. Nasierowski Bros.*, 949 F.2d at 899 (Martin, J., concurring) ("[W]e retain the finality requirements for procedural due process claims where we cannot find a single, concrete separate injury or where the procedural due process claim is in reality an adjunct to a taking or other constitutional claim."); *Bigelow v. Michigan Dep't of Natural Resources*, 970 F.2d 154, 160 (6th Cir. 1992) (concluding, in a case involving commercial fishermen whose fishing licenses were rendered worthless by a consent decree between Michigan, the federal government, and several Indian tribes, that when issues of procedural due process are ancillary to a takings issue, the plaintiffs could not

most essential sticks in the bundle of rights that are commonly characterized as property") (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)).

Moreover, although one usually does not think of a driveway as an independently marketable item, the driveway is on real property that is valuable and could otherwise be sold or devised. Because Carter County's position is that the driveway is a public road, Carter County presumably also believes that the Naves cannot sell the driveway or otherwise dispose of it, and that if the Naves wish to sell their property, the deed would have to reflect that Queen Nave Road is not the Naves' to sell.

There is another critical distinction between this case and *Williamson County*. Because the Naves' claim is that their property has been taken for a strictly private use, state eminent domain proceedings are unnecessary to determine whether there has been a constitutional violation. Private-use takings, rare as they may be, are unconstitutional regardless of whether just compensation is paid. *See, e.g.*, *Midkiff*, 467 U.S. at 245 ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void."); *Porter v. DiBlasio*, 93 F.3d 301, 310 (7th Cir. 1996) ("The Constitution forbids a taking executed for no other reason than to confer a private benefit on a particular private party, even when the taking is compensated."). Moreover, eminent domain proceedings do not supply the appropriate remedy. Unwilling landowners must accept being forcibly bought out by the state if the purchase is for a public use and if just compensation (which is "bare market value," *Gamble*, 5 F.3d at 287) is paid. A person whose property is confiscated for a strictly private use need not settle for "just compensation."

Requiring a plaintiff to wait before suing in federal court, when her sole claim is that she was dispossessed of property for a private use, would have only one apparent purpose—to force the plaintiff to vet her claims in state proceedings (such

as a state court declaratory judgment action to quiet title, as the county defendants have suggested) before the claims can be aired in federal court. But forcing the plaintiff to pursue state "remedial" procedures would be an exhaustion requirement, a requirement that *Williamson County* explicitly does not impose. *See Williamson County*, 473 U.S. at 193-94 (distinguishing the obtaining of final administrative action (required) from the exhaustion of judicial remedies (not required)); *see also Steffel v. Thompson*, 415 U.S. 452, 472-73 (1974) (noting the general rule that exhaustion of state remedies is not a prerequisite to a § 1983 action). Moreover, there is little question that Mary Nave's estate has received "final administrative action" from Carter County. Carter County's position is that unless the estate successfully pursues a remedial procedure (of the type that *Williamson County* observed need not be pursued in state court), the driveway is the county's property.

A problem arises when a plaintiff alleges alternatively that her property was taken for a private use (ripe for adjudication), but also that she is entitled to just compensation if it is determined that the taking was for a public use (not ripe until until the requirements of *Williamson County* are met). We conclude that to the extent that Mary Nave's estate claims that its property was taken for a private use, the claim is ripe and the estate may sue immediately without resorting to state remedies; but that to the extent that the estate claims that the taking was a taking for a public use without just compensation, the claim is not ripe until the requirements of *Williamson County* are met. That is the approach of the Fifth and Ninth Circuits. *See Samaad v. City of Dallas*, 940 F.2d 925 (5th Cir. 1991) (concluding that a private-purpose takings claim was immediately ripe for judicial determination, but that a claim of an uncompensated taking for a public purpose was not ripe); *Armendariz v. Penman*, 75 F.3d 1311, 1320-21 & n.5 (9th Cir. 1996) (en banc) ("Because a 'private taking' cannot be constitutional even if compensated, a plaintiff alleging such a taking would not need to seek compensation in state proceedings before

filing a federal takings claim under the rule of *Williamson County* . . . ."). The Seventh Circuit has reached the contrary conclusion, *see Covington Court, Ltd. v. Village of Oak Brook*, 77 F.3d 177, 179 (7th Cir. 1996) (holding that plaintiffs who assert claims of takings for strictly private purposes must nevertheless "exhaust" their remedies in state court). But the Seventh Circuit's opinion in *Covington* reads *Williamson County* as if it imposes an exhaustion requirement, and, as discussed above, it does not.

The county defendants suggest that allowing plaintiffs to split their claims in this fashion would encourage plaintiffs to attempt end runs around *Williamson County* simply by alleging that their property was taken for a private use and suing immediately. We disagree. Although it is easy to allege something in a complaint in order to state a cognizable federal claim, it is much more difficult to actually prove it, or even to demonstrate at the summary judgment stage that it could be proved to a reasonable trier of fact. In the overwhelming majority of cases, there will be virtually no chance that the plaintiff will be able to make the extraordinarily difficult showing that a taking had no rational connection to a minimally plausible conception of the public interest. Reasonable plaintiffs should understand this, and are unlikely to run to federal court to press a private-use takings claim on which there is virtually no chance of success. The possibility that some unreasonable plaintiffs might assert claims of private-use takings that are clearly meritless (incurring a significant risk of sanctions in the process) does not justify ignoring the Supreme Court's directive by imposing an exhaustion requirement on the few plaintiffs who can present colorable private-takings claims.

In summary, we conclude that to the extent that Mary Nave's estate claims that the driveway was taken for a private use, the claim is ripe, but to the extent that it alleges that the driveway was taken for a public use for which the estate is owed just compensation, the claim is not ripe. As a practical matter, this will not be a significant loss for Mary Nave's