*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0415p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

STEVE B. SMITH, DAVID KUCERA, VICKIE F. FORGETY,

        *Plaintiffs-Appellants,*

        *v.*

JEFFERSON COUNTY SCHOOL BOARD OF COMMISSIONERS; DOUGLAS R. MOODY, LANA LECKIE, BILL POWELL, DAVID LOCKHART, ANNE M. POTTS, GREG SHARPE, LOUISE SNODDERLY, Individually and in their official capacity as members of the Jefferson County Board of Education; KINGSWOOD SCHOOL INC.,

        *Defendants-Appellees.*

No. 06-6533

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 03-00593—Thomas W. Phillips, District Judge.

Argued: January 31, 2008

Decided and Filed: November 24, 2008

Before: MOORE, CLAY, and ROGERS, Circuit Judges.

---

**COUNSEL**

**ARGUED:** George F. Legg, STONE & HINDS, Knoxville, Tennessee, for Appellants. Arthur F. Knight III, BECKER, FLEISHMAN & KNIGHT, Knoxville, Tennessee, for Appellees. **ON BRIEF:** George F. Legg, Eric J. Morrison, STONE & HINDS, Knoxville, Tennessee, for Appellants. Arthur F. Knight III, BECKER, FLEISHMAN & KNIGHT, Knoxville, Tennessee, for Appellees.

      MOORE, J., delivered the opinion of the court, in which CLAY, J., joined. ROGERS, J. (pp. 16-20), delivered a separate dissenting opinion.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  The former principal of Jefferson County, Tennessee's alternative school and two former teachers at the school (collectively referred to as "the teachers"), allege that, by closing the county's public alternative school and contracting with Kingswood Academy ("Kingswood") to provide alternative-school services for public-school students, the Jefferson County School Board of Commissioners and its members (collectively referred to as "the Board") violated the teachers' (1) First Amendment Establishment Clause rights under the United States Constitution and similar rights under article I, section 3 of the Tennessee Constitution; and (2) procedural and substantive due-process rights under the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution. The teachers appeal the grant of summary judgment to the Board and its members on all of the teachers' claims, and the denial of the teachers' motion for partial summary judgment.

We hold that there is a genuine issue of material fact as to whether the Board violated the Establishment Clause.  In addition, we hold that the Board did not violate the teachers' procedural and substantive due-process rights, and that the individual Board members are entitled to legislative immunity.  Therefore, we **REVERSE** the district court's grant of summary judgment to the Board on the teachers' Establishment Clause claims and the district court's denial of legislative immunity to the Board members, and **REMAND** to the district court for further proceedings.  We **AFFIRM** the district court's grant of summary judgment to the Board on the teachers' procedural and substantive due-process claims.  Finally, because we hold that the individual Board members are entitled to legislative immunity, we need not address whether they are entitled to qualified immunity.

## I.  BACKGROUND

### A.  Factual Background

The Board employed all of the teachers in this case during the 2002-2003 school year. Vickie F. Forgety ("Forgety") and Steve B. Smith ("Smith") were tenured teachers.  Forgety served as the principal of the alternative school.  David Kucera ("Kucera") taught under a contract that entitled him to continue in his position for another year unless he was notified by April 15, 2003 of the nonrenewal of his contract.

#### 1.  Budget Cuts

After discussion of the budget on June 26, 2003, the Board voted to eliminate several programs, including the alternative school and the positions of the teachers and principal working there.  It voted again to "officially delete" the alternative school at its July 10, 2003 meeting.  Joint Appendix ("J.A.") at 351 (July 10, 2003 Minutes of the Regular Meeting).  In addition, the Board voted at the July meeting to contract with Kingswood to provide alternative-school services for public-school students for the 2003-2004 academic year.  The contract between the Board and Kingswood specifically stated that Kingswood personnel would not be considered employees of the Board.  In fact, Director of Schools for the county, Douglas Moody ("Moody"), was not authorized to hire or fire the Kingswood employees who provided the alternative-school services, nor did he supervise or evaluate those individuals.  Counsel for the Board, Chuck Cagle ("Cagle"), approved the contract.

Moody submitted a "Request for Closing a School" to the Tennessee Department of Education on July 23, 2003, indicating that "[b]udget constraints for FY 2003-2004 led to a School

Board decision to outsource Alternative school services on contract." J.A. at 361. He stated that he had only one reason for recommending the Kingswood contract to the Board: "it was entirely a financial consideration that would fit in with other budget cuts." J.A. at 159 (Moody Dep. at 46). Similarly, the Chair of the Board, Lana Leckie ("Leckie"), stated in her deposition that finances were "the primary reason to enter into the contract" and that it would save them $171,423. J.A. at 378 (Leckie Dep. at 34).

Moody informed Forgety, Smith, and Kucera of the abolishment of their positions after the Board's decision. Each of the teachers eventually found a new position, though only one continued her employment with the Board. As tenured teachers, Forgety and Smith were placed on a "Preferred List for Re-employment of Tenured Teachers." J.A. at 243. Forgety declined to accept the positions the Board initially offered to her because she considered them to be inferior in pay and rank to her previous position at the alternative school; she drew unemployment for the 2003-2004 school year. When the Board offered Forgety a principalship in the spring of 2004, she accepted. Smith, however, did not respond to the Board's offer of a history position in the fall of 2003; he had accepted a history position in Georgia in late July 2003. Kucera, a non-tenured teacher, drew unemployment pay for two months; by November 2003, he had not received any offers of employment from the Board in areas in which he was certified. Eventually, he took a job with Mountain View Youth Development Center as a case manager.

### 2. Kingswood

In a sworn statement, the "Administrator" of Kingswood, Darrell M. Helton ("Helton"), stated that the school is an accredited private school, providing "day treatment programs for children and adolescents who have behavioral and/or emotional problems." J.A. at 178 (Sworn Statement of Helton). Helton noted that the school is licensed by the Tennessee Department of Mental Health and Developmental Disabilities. Also, he noted that an April 2005 study of Tennessee's alternative schools by "the Tennessee Comptroller of the Treasury Office of Education Accountability . . . specifically identified as [sic] Kingswood School, Inc. [as] a private contract provider of alternative school services that local education agencies could explore to provide alternative schooling to their students." J.A. at 178 (Sworn Statement of Helton); J.A. 327 (Tennessee's Alternative Schools at 37). In addition, Helton stated that Kingswood had contracted with Jefferson, Grainger, Hancock, and Claiborne counties in Tennessee to provide alternative-school services.

Kingswood's promotional materials state that "[f]or over 60 years Kingswood School and Home for Children has helped children who have been abused, abandoned and neglected. Kingswood School is unique because we offer children a Christian environment of love and encouragement." J.A. at 454 (Happy Easter, 2006 letter from Kingswood). The school's 2005 Annual Report states that "Kingswood was founded with the intent to insure that each child placed in its care receives Christian religious training. A unique feature of the Kingswood program is the emphasis that is placed upon instilling in each child a personal faith in God, and the assurance of the saving grace of Jesus Christ while remaining unaffiliated with any specific denomination or Church." J.A. at 457 (Annual Report). The 2005 Annual Report also states that Kingswood's "ministry" can be supported in many ways. J.A. at 456 (Annual Report). Although the residential-care description states that there is an "emphasis" on "spiritual" growth, the day-treatment description does not include that statement. J.A. at 456 (Annual Report).

## B. Procedural Background

The district court consolidated cases brought by Forgety, Smith, and Kucera.[1] Together the teachers brought suit against the Jefferson County School Board of Commissioners and its members in their official and individual capacities[2] under 42 U.S.C. § 1983, the Establishment Clause, and Fifth and Fourteenth Amendments of the United States Constitution. Also, they brought suit under various provisions of the Tennessee Constitution and Code. The teachers sought declaratory relief and damages. Specifically, their third amended complaint requested

> 1. That this Court issue a judgment declaring that the acts of School Defendants in eliminating the Jefferson County Alternative School Program were illegal and *ultra vires* acts, and thus were void acts. Further, and accordingly, that this Court further declare that any procedural due process which attached to those void acts was likewise void. Further, that this Court directly evaluate the challenged procedures to ensure that they comport with due process, and that this Court declare that the procedures invoked by School Defendants did not so comport with due process.

> 2. That this Court issue a judgment declaring that the acts of School Defendants hereinbefore complained of violated the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, the Constitution of the State of Tennessee, and the Tennessee Code Annotated §§ 49-2-203, 49-5-501 et seq., and 49-6-3402, and further denied Plaintiffs equal protection of the law. Further that this Court issue a judgment declaring that the acts of School Defendants hereinbefore complained of violated Plaintiffs' constitutional rights protecting them from the impairment of the obligations of their contracts. . . . That the Court also issue a judgment finding and declaring that the acts of the Defendants violated Plaintiffs' rights under The Establishment Clause of the First Amendment to the United States Constitution and under Article I, Section 3 of the Tennessee Constitution.

> 3. That this Court issue a judgment directing School Defendants to make Plaintiffs whole for all losses of wages, benefits, and all other terms and conditions of employment, and further directing and ordering said Defendants to pay compensatory damages to Plaintiffs for all damages Plaintiffs have suffered . . . in the amount of $1,000,000.00 for Plaintiff, Steve B. Smith, in the amount of $100,000.00 for Plaintiff, David Kucera, and in the amount of $1,000,000.00 for Plaintiff Vickie F. Forgety.

J.A. at 58 (Third Am. Compl. at ¶ 40).

On August 9, 2006, the teachers moved for partial summary judgment "on the Federal Establishment Clause and Due Process claims and upon the pendent State claims, on the issue of liability, and the legality of Defendants' actions." J.A. at 390. Less than two weeks later, the Board

---

[1]Forgety filed suit on June 24, 2004 against the same entities and individuals that Smith and Kucera had filed suit against on November 13, 2003. Forgety, Smith, and Kucera did not oppose the defendants' motion to consolidate the cases, and the district court ordered consolidation on January 18, 2005.

[2]The teachers sued the Director of Schools, Moody (who also served as Secretary to the Board) and the following Board members in both their official and individual capacities: Lana Leckie, Bill Powell, David Lockhart, Anne M. Potts, Greg Sharpe, Louise Snodderly. The only Board member that the teachers did not bring suit against, Emily Fox, voted against the program cuts that affected the alternative school.

filed a cross-motion for summary judgment. The Tennessee Education Association filed an amicus curiae brief. On November 2, 2006, the district court denied the teachers' motion for partial summary judgment and granted the Board's motion for summary judgment. The teachers filed a timely appeal.

## II. ANALYSIS

### A. Standards of Review

We review a district court's grant of summary judgment de novo. *Mazur v. Young*, 507 F.3d 1013, 1016 (6th Cir. 2007). "Summary judgment is proper if the evidence, taken in the light most favorable to the nonmoving party, shows that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c)). "Although the denial of a motion for summary judgment is usually an interlocutory order that is not immediately appealable, where an appeal from a denial of summary judgment is presented in tandem with a grant of summary judgment, this court has jurisdiction to review the propriety of the district court's denial of summary judgment." *Tenn. ex rel. Wireless Income Props., LLC v. City of Chattanooga*, 403 F.3d 392, 395 (6th Cir. 2005) (internal quotation marks omitted). We review de novo denials of motions for summary judgment "'on purely legal grounds'"; we review for abuse of discretion denials "based on the finding of a genuine issue of material fact." *Id.* at 395-96 (quoting *McMullen v. Meijer, Inc.*, 355 F.3d 485, 489 (6th Cir. 2004)).

When the district court reaches conclusions of law regarding standing, we review the district court's decision de novo. *Doe v. Porter*, 370 F.3d 558, 561 (6th Cir. 2004). In addition, "[t]he issue [of] whether qualified immunity is applicable to an official's actions is a question of law." *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996). Finally, if a district court does not rule on an issue raised by the parties in their summary judgment motions, we may rule on such issues under 28 U.S.C. § 2106 without remanding them, as long as the parties were given a full and fair opportunity to address those issues. *See Trustees of the Mich. Laborers' Health Care Fund v. Gibbons*, 209 F.3d 587, 594-95 (6th Cir. 2000) (holding that a court of appeals may order entry of summary judgment when "the parties . . . had a chance to dispute facts material to the plaintiffs' claim"); *United States v. 5 S 351 Tuthill Road, Naperville, Ill.*, 233 F. 3d 1017, 1024-25 (7th Cir. 2000) (reversing the district court's holding that a claimant did not have standing and determining that summary judgment was not appropriate for either party because key facts were not included in the record).

### B. Establishment Clause Claim

#### 1. Standing

As a threshold matter, we must determine whether the teachers have standing to bring their federal Establishment Clause claim. Although the parties' cross-motions for summary judgment raised the issue of whether the teachers had established both individual standing and municipal-taxpayer standing, the district court addressed only individual standing in its decision. The district court concluded that the teachers did not meet the individual standing requirements necessary to bring an Establishment Clause claim because their alleged injuries were the direct result of the Board's decision to allow a third party to run the alternative school, not the result of that third party being a "faith based organization." J.A. at 69 (Dist. Ct. Op. at 9). On appeal, the teachers argue that they meet the requirements for both individual standing and municipal-taxpayer standing. We hold that all of the teachers have individual standing to bring suit, but only Forgety and Kucera meet the municipal-taxpayer standing requirements.

### a. Standing as Individuals

The teachers argue that they have established all of the elements necessary for individual standing:  they were injured by being "dispossessed" of their property interest in their positions, Appellants Br. at 16, the Board's actions directly caused their injuries, and payment of lost salary could redress the injury.  The Board argues that the teachers do not have standing because their alleged injuries did not occur as a result of any religious belief.  We conclude that the teachers have met the requirements necessary to establish individual standing.

Standing to bring suit must be determined at the time a plaintiff files a complaint.  *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004), *cert. denied*, 544 U.S. 949 (2005).  A plaintiff must meet both the constitutional and prudential requirements necessary to establish individual standing.  To meet the minimum constitutional standards for individual standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000).  As emphasized in *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982), plaintiffs must identify a "personal injury suffered by them *as a consequence* of the alleged constitutional error."  The Supreme Court "repeatedly has rejected claims of standing predicated on the right possessed by every citizen[] to require that the Government be administered according to law."  *Id*. at 482-83 (internal quotation marks omitted).

In addition to the above constitutional requirements, a plaintiff must meet a set of prudential standing requirements developed by the Supreme Court.  First, a complaint must "fall within the 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'"  *Id*. at 475 (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970)).[3]  Second, plaintiffs "generally must assert [their] own legal rights and interests, and cannot rest [their] claim to relief on the legal rights or interests of third parties."  *Valley Forge*, 454 U.S. at 475 (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).  Third, and finally, plaintiffs must present a claim that is "more than a generalized grievance."  *City of Cleveland v. Ohio*, 508 F.3d 827, 835 (6th Cir. 2007) (internal quotation marks omitted).

We hold that the teachers satisfy the constitutional and prudential requirements necessary to establish individual standing.[4]  When the Board abolished the public alternative school during the

---

[3]The dissent frames the zone-of-interests test as a loosening of the rule that parties cannot assert the rights of third parties and argues that the zone-of-interests analysis is properly applied only to cases concerning the Administrative Procedure Act.  Dissent at 17-18.  However, the Supreme Court has held in a First Amendment standing case that "prudential standing encompasses 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'"  *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  Similarly, in *Valley Forge*, the Supreme Court included the zone-of-interests test as a prudential standing requirement that the plaintiffs would have to meet to proceed with their Establishment Clause claims.  *Valley Forge*, 454 U.S. at 475.  Additionally, we have noted that the Supreme Court "has declined to hold that the APA represents the *only* framework under which to apply the zone of interest  test" and that "[t]his Circuit has applied the zone of interest test outside the context of the APA on numerous occasions.  *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 292 (6th Cir. 2006) (also citing several Supreme Court cases and Sixth Circuit cases in support of application of zone-of-interests test outside APA).  Thus, a plaintiff asserting a First Amendment right must show that he or she meets each of these three separate tests identified in the text.

[4]Previously, we noted that in First Amendment challenges the plaintiff "does not bear a heavy burden to 'demonstrate a claim of specific present objective harm or a threat of specific future harm.'"  *Briggs v. Ohio Elections Comm'n*, 61 F.3d 487, 492 (6th Cir. 1995) (quotations omitted).

summer of 2003, the teachers suffered an injury because they lost their positions at the school and were not transferred to other positions. Their injuries are directly linked to the Board's decision to abolish the alternative school that it once operated in order to contract-out for the services of Kingswood's staff.

The dissent concedes that the teachers suffered an injury when their positions were terminated, but asserts that they lack standing because their injuries "do not fall within the protection of the Establishment Clause." Dissent at 16. In making this assertion, the dissent ignores the reality of the Board's action. Not only were the teachers injured by the loss of their jobs, this loss is directly traceable to the Board's decision to outsource alternative education to a religious institution. State law requires the Board to establish at least one alternative school for grades seven through twelve. *See* Tenn. Code Ann. § 49-6-3402. Once the Board eliminated the alternative school and terminated the teachers, it was required to fund a new alternative school. Therefore, the termination of the teachers necessitated the reinstatement of some alternative-school program, and the Board's decision to outsource its duties to provide an alternative school to a secular entity cannot be separated from its decision to eliminate the non-sectarian alternative school and to terminate the teachers. As this series of decisions is intertwined, the teachers have alleged an injury that falls within the protection of the Establishment Clause—namely the loss of their jobs due to the Board's decision to use a sectarian entity to fulfill its duty to provide an alternative school.

In addition, the teachers' injuries are redressable. For example, each teacher seeks redress in the form of lost salary and other benefits, for which the Board could compensate them. Therefore, we conclude that the teachers meet the constitutional standing requirements.

The teachers satisfy the prudential standing requirements as well. The teachers' injuries fall within the zone of interests protected by the Establishment Clause. The Establishment Clause "commands a separation of church and state," and the Board's failure to preserve this separation is at the heart of the teachers' claims. *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). The Board's actions did not transfer the teachers' jobs to other employees of the Board; rather, the Board transferred their jobs to an allegedly sectarian entity.[5] In *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153-54 (1970), the Supreme Court was careful to explain that both economic and non-economic injuries will suffice to establish standing. The fact that the teachers allege an economic injury resulting from a violation of an amendment meant to protect spiritual and religious freedom does not put them outside the zone of interests. The Establishment Clause "prevents a State from enacting laws that have the 'purpose' or 'effect' of advancing or inhibiting religion." *Zelman v. Simmons-Harris*, 536 U.S. 639, 648-49 (2002) (quoting *Agostini v. Felton*, 521 U.S. 203, 222-23 (1997)). These teachers lost their jobs when their secular positions were outsourced to a religious institution, a type of harm that clearly falls within the zone of interests defined by an amendment meant to keep government neutral and secular.

The dissent argues that the teachers do not have standing because they were not "forced by the state to interact with a religion." Dissent at 16. This argument does not defeat the teachers' claims of standing, because, as the Supreme Court has held, "a violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended." *School Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 223 (1963).

---

[5]The Supreme Court has held that an Establishment Clause violation occurred when a government entity delegated part of its power to a religious institution. *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 120-27 (1982).

The dissent argues that the teachers' "Establishment Clause claim patently asserts the injury of others" and that they should not be awarded third-party standing.[6] Dissent at 17. The teachers, however, do not assert an injury other than their own. *See* Appellants Br. at 16-18. The dissent quotes the teachers' brief as stating that "'[t]he placement of the students into such a religiously oriented school with teachers who are employed and solely answerable to Kingswood cannot be said to be generated by some secular purpose.'" Dissent at 17 (quoting Appellants Br. at 29). This sentence is taken from the portion of the teachers' brief which addresses the merits of their Establishment Clause claim, specifically the government's purpose underlying the challenged practice, and it does not describe an injury that they assert or ask us to address. Appellants Br. at 29. Instead, as the dissent recognizes, the teachers assert the injuries they suffered when the Board outsourced their jobs to a sectarian entity. Dissent at 16. Accordingly, the teachers do not raise a third-party claim, and we do not need to analyze whether the teachers have standing to assert the rights of a third party.

Finally, the teachers are not presenting a generalized grievance. They are complaining that they have lost their jobs because of the outsourcing of the alternative school to a sectarian entity.

For these reasons, we conclude that the teachers have met the prudential standing requirements. Thus, the teachers have established individual standing; the hurdle is not as high as the district court imagined.

### b. Standing as Municipal Taxpayers

In addition to individual standing, the teachers argue that they have also established municipal-taxpayer standing. They contend that because they were municipal taxpayers at all times relevant to the suit,[7] they have standing to bring suit regarding an expenditure of municipal funds alleged to be in violation of the Establishment Clause. The Board argues that it did not directly subsidize a sectarian school, and that the teachers have not established that the funds that the Board contracted to pay Kingswood would result in a "measurable appropriation or loss of revenue" that would cause "a direct monetary injury" to the teacher-taxpayers. Appellees Br. at 43. We conclude that two of the teachers have established municipal-taxpayer standing.

The Supreme Court recognizes three types of taxpayer standing: federal, state, and municipal. *Hawley v. City of Cleveland*, 773 F.2d 736, 741-42 (6th Cir. 1985); *Johnson v. Econ. Dev. Corp. of County of Oakland*, 241 F.3d 501, 508 (6th Cir. 2001). All three categories of taxpayers must demonstrate that they were injured, that the challenged action caused their injury, and that the court could provide relief to redress that injury. *D.C. Common Cause v. District of Columbia*, 858 F.2d 1, 5 (D.C. Cir. 1988) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)). Although "federal taxpayers normally lack standing to sue to enjoin federal expenditures which they regard as unconstitutional," *Hawley*, 773 F.2d at 741, "the Supreme Court continues to allow suits by nonfederal taxpayers to enjoin unconstitutional acts affecting public finances." *Id.* at 742.

In order to establish standing, federal and state taxpayers must demonstrate a "'good-faith pocketbook' injury." *Johnson*, 241 F.3d at 507-08 (quoting *Doremus v. Bd. of Educ. of Borough of Hawthorne*, 342 US. 429, 434 (1952)); *Taub v. Kentucky*, 842 F.2d 912, 918 (6th Cir. 1988) ("We conclude that the requirements for federal taxpayer standing announced in *Frothingham* control the

---

[6] The bulk of the dissent argues that the teachers do not have third-party standing to assert injuries to students and parents who are forced "to interact with a religion at their school." We do not consider whether the teachers have third-party standing to challenge the Board's actions; instead, we hold that the teachers have standing to assert their own Establishment Clause injuries.

[7] Forgety and Kucera were still municipal taxpayers at the time they brought this suit; Smith was not.

issue of state taxpayer standing at least in those cases where violation of the Establishment Clause is not alleged."). However, plaintiffs seeking to establish municipal-taxpayer standing are required to meet a less rigorous injury standard than those seeking federal- or state-taxpayer standing. *Taub*, 842 F.2d at 918. Unlike federal or state taxpayers, municipal taxpayers may fulfill the injury requirement by pleading an alleged misuse of municipal funds. In *Frothingham v. Mellon*, 262 U.S. 447 (1923), the Supreme Court "described the municipal taxpayer's injury as the 'misuse' of municipal funds." *D.C. Common Cause*, 858 F.2d at 5 (citing *Frothingham*, 262 U.S. at 486); *see Cammack v. Waihee*, 932 F.2d 765, 770 (9th Cir. 1991) ("[E]ven those who have taken a dimmer view of the breadth of state taxpayer standing than this court have recognized that municipal taxpayer standing requires no more injury than an allegedly improper municipal expenditure."), *cert. denied*, 505 U.S. 1219 (1992).

The Supreme Court has explained the rationale for its interpretation of the "injury" necessary to establish municipal-taxpayer standing: "[t]he interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate." *Frothingham*, 262 U.S. at 486. As we have noted, "[t]he rule upholding municipal taxpayer standing appears to rest on the assumption that the relatively small number of taxpayers involved and the close relationship between residents of a municipality and their local government results in a direct and palpable injury whenever tax revenues are misused." *Taub*, 842 F.2d at 918. Indeed, the Supreme Court "analogized the municipal taxpayer to the corporate shareholder, who has the right to sue to enjoin *ultra vires* acts by the corporation." *D.C. Common Cause*, 858 F.2d at 5.

The dissent argues that the teachers do not have municipal-taxpayer standing because they have shown no depletion of the municipal fisc. Dissent at 18. However, the teachers need only show "misuse" of municipal money, not depletion of funds. *Frothingham*, 262 U.S. at 486. The municipality may have saved money by outsourcing alternative schooling, but the injury asserted is that municipal money was paid to a religious institution in violation of the Establishment Clause. It is settled law that "the 'injury' alleged in Establishment Clause challenges to federal spending [is] the very 'extract[ion] and spen[ding]' of 'tax money' in aid of religion." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 348 (2006) (quoting *Flast v. Cohen*, 392 U.S. 83, 106 (1968)). This type of injury will be even more pronounced when municipal taxes are involved, because, as the dissent concedes, the municipal taxpayer is more personally affected by local expenditures than by federal ones. *See, e.g.*, *Frothingham*, 262 U.S. at 486; Dissent at 18, 20. In *Doremus*, 342 U.S. at 433, a case that the dissent relies on heavily, the Supreme Court found that the plaintiffs lacked standing because they had failed to allege that any government money had been spent on religious activities. Similarly, in *Hawley v. City of Cleveland*, 773 F.2d 736 (6th Cir. 1985), there was no allegation that the government was directly giving money to a religious institution. Neither case stands for the proposition that taxpayer standing requires a diminution of the public fisc. Instead, the question is whether funds have been appropriated unlawfully. The teachers here have pointed to "a measurable appropriation or disbursement of school-district funds occasioned solely by the activities complained of," as *Doremus* required. *Doremus*, 342 U.S. at 434; Dissent at 18-19; *see also D.C. Common Cause*, 858 F.2d at 5 ("When a municipal taxpayer can establish that the challenged activity involves a *measurable appropriation* or loss of revenue, the injury requirement is satisfied." (emphasis added) (citing *Hawley*, 773 F.2d at 741-42)). Therefore, whether or not this payment to Kingswood saved the municipality money, the teachers as taxpayers have sufficiently alleged an injury based on the argument that municipal funds were misused in violation of the Establishment Clause when the government contracted with Kingswood.

If a plaintiff establishes an injury, he or she then turns to the requirements of showing causation and redressability. When plaintiffs' only request for relief is an order enjoining the conduct at issue, "causation and redressability are essentially identical requirements." *D.C. Common Cause*, 858 F.2d at 5 (citing *Allen*, 468 U.S. at 753 n.19). "[T]he taxpayer need not show

that the specific taxes he paid were used unlawfully, nor that his taxes will be reduced as a result of the judgment. By enjoining an illegal expenditure, the court can redress the taxpayer's injury caused by the misuse of public funds and ensure that the funds will be devoted to lawful purposes of possible benefit to the taxpayers." *Id.* Although federal taxpayers seeking to establish standing must allege "a nexus between their status as taxpayers and the government action challenged (i.e., an exercise of congressional power under the taxing and spending clause of Art. I, section 8 of the Constitution)" and "a nexus between the taxpayer injury and the constitutional claim (i.e., that the action exceeds a specific limitation on that clause)," a municipal taxpayer need only meet the first nexus requirement because the second requirement was established to address separation of powers concerns (something not applicable in the municipal context). *Id.* at 6.

We conclude that Forgety and Kucera have met all of the requirements necessary to establish municipal-taxpayer standing. As a threshold matter, we note that Jefferson County is considered a municipality under Tennessee law. *Weakley County Mun. Elec. Sys. v. Vick*, 309 S.W. 2d 792, 804 (Tenn. Ct. App. 1957) ("'Counties in this State have always been held to be public municipal corporations with limited powers, and liable as such.'") (quotation omitted); *Jackson v. City of Paris*, 228 S.W.2d 1015, 1016 (Tenn. Ct. App. 1949). In addition, the Board did not dispute on appeal that Forgety and Kucera were taxpayers of the municipality at the time they brought suit, nor did it dispute that all of the teachers were taxpayers at the time that the Board abolished the alternative school in favor of paying Kingswood for providing services to the public school students.

Forgety and Kucera have established all of the elements necessary to achieve municipal-taxpayer standing. They established an injury, that the allegedly unconstitutional expenditure caused this injury, and that the injury could be redressed through their action in district court. The injury alleged by the teacher-taxpayers is the appropriation of funds, a base sum of $200,000, to pay Kingswood to provide alternative-school services for public-school students. The teachers argue that the appropriated funds were misused because the contract with Kingswood, an allegedly sectarian school, violates the Establishment Clause. Such alleged misuse of municipal funds qualifies as a "direct and palpable" injury. *Taub*, 842 F.2d at 917. By declaring this expenditure unconstitutional, the district court could redress the teacher-taxpayers' injuries.

As noted above, Smith did not live in the municipality when he brought suit with Forgety and Kucera. Because Smith has standing as an individual, we do not need to decide whether he has standing to bring suit as a municipal taxpayer as well. Based on the foregoing, we conclude that Forgety and Kucera have established municipal-taxpayer standing.

## 2. Establishment Clause Violation

Having established that the teachers have standing, we now turn our attention to the alleged violation of the Establishment Clause of the United States Constitution. The teachers contend that the Board violated their rights by contracting with Kingswood. They argue that the Board has a duty under Tennessee law to maintain and manage an alternative public school, and that the Board violated the Establishment Clause by delegating this duty to a sectarian school. In addition, they contend that the Board's budgetary concerns do not excuse the Board's violation of the Establishment Clause. Finally, the teachers stress that they have never conceded that Kingswood separates its residential and day programs such that public-school children are not exposed to a Christian message.

The Board argues that the teachers have two theories—the trickle-down theory and the delegation theory—upon which they base their claim that a violation of the Establishment Clause occurred; neither, contends the Board, has merit. First, the Board asserts that there is no evidence in the record that funds provided by the Board to Kingswood for the day program in which public-school students participate "trickle-down" to Kingswood's religious residential program. Appellees

Br. at 47. The Board maintains that the contract at issue could be classified as constitutionally sound aid to a parochial school. Second, the Board asserts that this case is not an illustration of a government delegating "a unique government function" to a sectarian entity. *Id.*

The Establishment Clause states that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. Applied to the states through the Fourteenth Amendment, the Establishment Clause "prevents a State from enacting laws that have the 'purpose' or 'effect' of advancing or inhibiting religion." *Zelman*, 536 U.S. at 648-49 (quoting *Agostini v. Felton*, 521 U.S. 203, 222-23 (1997)). We use factors developed by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971), and modified by *Agostini* to analyze whether direct government aid violates the Establishment Clause. *See Zelman*, 536 U.S. at 649. First, we consider "whether the government acted with the purpose of advancing or inhibiting religion." *Agostini*, 521 U.S. at 222-23. Second, we "explore whether the aid has the 'effect' of advancing or inhibiting religion." *Id*. at 223. Although in the past we engaged in a third inquiry to examine whether the aid program created an "excessive entanglement between church and state," *id*. at 232, *Agostini* folds entanglement analysis into the effect analysis because "entanglement is . . . an aspect of the inquiry into a statute's effect." *Id*. at 233.

> Regardless of how we have characterized the issue, however, the factors we use to assess whether an entanglement is 'excessive' are similar to the factors we use to examine "effect." That is, to assess entanglement, we have looked to "the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority." Similarly, we have assessed a law's "effect" by examining the character of the institutions benefitted (*e.g.*, whether the religious institutions were "predominantly religious"), . . . and the nature of the aid that the State provided (*e.g.*, whether it was neutral and nonideological).

*Id*. at 232.

After examining the evidence presented regarding the nature of the Kingswood learning environment for public-school students and the contractual relationship between Kingswood and the Board, we hold that there is a genuine issue of material fact that must be resolved before a court could determine whether the Board violated the Establishment Clause. Under Tenn. Code Ann. § 49-6-3402, the Board is required to establish at least one alternative school for grades seven through twelve. Although the stated secular purpose of the Board—affording an education to alternative school students in the public-school system by sending them to the private Kingswood School in order to help resolve a budget crisis—arguably predominates over any inclination of the Board to advance religion, if the day program was infused with the same focus on Christianity as the residential program, a reasonable person could conclude that the Board was endorsing religion by delegating all of its duties to Kingswood. *See Larkin*, 459 U.S. at 123-24 ("There can be little doubt that this embraces valid secular . . . purposes. However, these valid secular objectives can be readily accomplished by other means." (footnote omitted)).

The teachers contend that there is no separation between the day and residential programs. The record before us largely supports this view. For example, Cagle, the Board's attorney, stated during his deposition that he was aware that Kingswood School was a "Christian academy." J.A. at 474 (Cagle Dep. at 27). Moreover, Helton, the head of Kingswood, stated in his deposition that the residential and day programs had always gone hand-in-hand; "it has always been my understanding that [the founder] wanted to provide a Christian education as well as a residential program." J.A. at 447-48 (Helton Dep. at 5-6). However, despite the above record evidence indicating that Kingswood provides a residential and a day program that have a Christian focus, the record includes evidence that creates a genuine issue of material fact as to whether the day program

attended by the alternative school students has any religious aspects: the residential-care description in the 2005 Report states that there is an "emphasis" on "spiritual" growth, but the day-treatment description does not.[8] J.A. at 456. Viewing the facts in a light most favorable to the Board, as we must when considering the teachers' motion for summary judgment, we hold that there is a genuine issue of material fact as to whether Kingswood separates its residential program from its day program such that the Christian religious focus of the residential program does not affect day students. Therefore, with respect to the teachers' Establishment Clause claims under the United States Constitution, we **REMAND** the case to the district court for further proceedings consistent with this opinion. We also **REMAND** the teachers' Establishment Clause claims under the Tennessee Constitution for the district court to consider in the first instance.

## C. Procedural Due Process

In addition to their Establishment Clause claim, the teachers also raise a procedural-due-process claim. The district court did not analyze this claim; instead, it granted summary judgment to the Board based on its holding that the teachers failed to pursue their post-deprivation remedies. The teachers argue that their property rights include "the right not to be dismissed by abolition except in compliance with state law." Appellants Br. at 33-34. Also, the teachers contend that their positions were not abolished, but, rather, were improperly delegated. The Board asserts that even if the teachers could establish a property interest in their positions, nonetheless the teachers received all of the process that they were due because the Board was acting in a legislative capacity when it abolished the alternative school.

Analysis of the teachers' procedural-due-process claim involves two steps: establishing whether the teachers have a property interest in their positions, and determining what process (if any) is due them. *Leary v. Daeschner*, 228 F.3d 729, 741 (6th Cir. 2000). However, even if we assume that the teachers have property interests in their teaching positions, we cannot conclude that the Board violated the teachers' procedural-due-process rights because of the nature of the Board's activities. In order to determine whether the teachers received due process, the facts of the case require us to categorize the actions of the Board as it went through the budgetary process that led to the abolishment of the alternative school.

When examining the activities of an entity such as the Board, "'[w]e find little guidance in formalistic distinctions between "legislative" and "adjudicatory" or "administrative" government actions.'" *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 896 (6th Cir. 1991) (quoting *Harris v. County of Riverside*, 904 F.2d 497, 501-02 (6th Cir. 1990)). "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998); *see Nasierowski*, 949 F.2d at 896. Legislative functions involve "integral steps in the legislative process." *Bogan*, 523 U.S. at 54. In *Bogan*, the hallmarks of traditional legislation were described as "a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents," and actions that terminate a position "may have prospective implications that reach well beyond the particular occupant of the office." *Id*. at 55-56. No notice or hearing is required before legislative action. *37712, Inc. v. Ohio Dep't of Liquor Control*, 113 F.3d 614, 619 (6th Cir. 1997) (citing *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 244-45 (1973)). "[L]egislation normally is general in its scope rather than targeted on a specific individual, and its generality provides a

---

[8] Although the principal of Kingswood, Larry Clay, stated that the Christian-based residential program is separate from the day program and that teachers do not proselytize students, J.A. at 770-71 (Clay Aff. at ¶¶ 2-3), we cannot consider his statement because it is unsigned, unsworn, and undated. We have previously held that "[u]nsworn declarations are permitted to be used as evidence only if 'subscribed . . . as true under penalty of perjury, and dated." *Bonds v. Cox*, 20 F.3d 697, 702 (6th Cir. 1994) (citing 28 U.S.C. § 1746).

safeguard that is a substitute for procedural protections." *Ind. Land Co., LLC v. City of Greenwood*, 378 F.3d 705, 710 (7th Cir. 2004).

Because the Board engaged in legislative activity when it made the budgetary determinations that eliminated the alternative school, we hold that the Board did not violate the teachers' procedural-due-process rights. The Board's decision to abolish the alternative school and contract with Kingswood in order to save money was the result of weighing budgetary priorities, a legislative activity. *See Bogan*, 523 U.S. at 55-56. Thus, because the Board was engaged in a legislative activity, there was no requirement that the teachers be given notice or an opportunity to be heard prior to the Board's decision to abolish the alternative school. *See 37712, Inc.*, 113 F.3d at 619. In such circumstances, "the legislative process provides all the process that is constitutionally due" when a plaintiff's alleged injury results from a legislative act "of general applicability." *75 Acres, LLC v. Miami-Dade County*, 338 F.3d 1288, 1292 (11th Cir. 2003). Therefore, we hold that the Board's actions did not violate the teachers' procedural-due-process rights.

## D. Substantive Due Process

In addition to their procedural-due-process claim, the teachers raise a substantive-due-process claim. The district court concluded that "all substantive due process claims collapse into the decision on the plaintiffs' First Amendment . . . Establishment Clause claim[]." J.A. at 73 (Dist. Ct. Op. at 13). The teachers argue that "[a]lthough substantive due process protections are limited, Plaintiffs may, in the context of a § 1983 action, establish a substantive due process claim when some state action has deprived them of a particular constitutional guarantee." Appellants Br. at 43. The teachers contend that the record demonstrates that their positions were not eliminated, but "merely delegated to a religious organization" in violation of the Establishment Clause. Appellants Br. at 33-34. The Board, however, argues that because the teachers alleged a violation of the Establishment Clause, they may not recover under the generalized concept of substantive due process.

Substantive-due-process challenges usually do not survive if a provision of the Constitution directly addresses the allegedly illegal conduct at issue. *Montgomery v. Carter County*, 226 F.3d 758, 769 (6th Cir. 2000). We have held that

> [b]ecause of the highly destructive potential of overextending substantive due process protection, *see, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (explaining the dangers), and because the doctrine's borders are so undefined, the Supreme Court has repeatedly cautioned that the concept of substantive due process has no place when a provision of the Constitution directly addresses the type of illegal governmental conduct alleged by the plaintiff. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 394-95 (1989) (concluding that the reasonableness or unreasonableness of force used by police during an investigatory stop or arrest must be analyzed as a Fourth Amendment claim, rather than under "the more generalized notion of 'substantive due process'").

*Id.* Because the teachers' Establishment Clause claim directly addresses the conduct at issue, we affirm the district court's decision to dismiss the teachers' substantive-due-process claim.

## E. Legislative Immunity

The Board members raise legislative and qualified immunity as defenses to the claims brought against them by the teachers. Having granted summary judgment to the Board on all of the teachers' claims, the district court held that the Board members' defenses of legislative and qualified immunity were moot. However, because we have found a genuine issue of material fact preventing a grant of summary judgment to either party on the teachers' Establishment Clause claim, we must

consider the parties' arguments regarding immunity. Because we hold that the Board members are entitled to legislative immunity, we do not need to address their claim that they are entitled to qualified immunity.

The teachers argue that the individual Board members are not legislators, and that their actions were void under Dillon's Rule.[9] However, the Board members respond that they were performing a legislative function when they abolished the school, and, therefore, they should be granted legislative immunity. The Board members did not address the teachers' Dillon's Rule argument.

We recognize that local legislators can be sued both in their individual and in their official capacities. Although plaintiffs may sue a local legislator in his or her *official* capacity under § 1983, local legislators may invoke legislative immunity to insulate themselves as *individuals* from liability based on their legislative activities. *Bogan*, 523 U.S. at 49; *Canary v. Osborn*, 211 F.3d 324, 328 (6th Cir. 2000) (citing *Bogan*, 523 U.S. at 49); *Minton v. St. Bernard Parish Sch. Bd.*, 803 F.2d 129, 134-35 (5th Cir. 1986) (holding that absolute legislative immunity would shield officials from liability in their individual capacity). In other words, local legislators will not face personal liability for their legislative activities. "The immunity granted . . . applies whether the relief sought is money damages[,] or [declaratory or] injunctive relief." *Alia v. Mich. Supreme Court*, 906 F.2d 1100, 1102 (6th Cir. 1990); *see Supreme Court of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 732-33 (1980). Officials who are not part of the legislature "are entitled to legislative immunity when they perform legislative functions." *Bogan*, 523 U.S. at 55.

Because we determined in our analysis of the teachers' procedural-due-process claim that the Board was performing a legislative function, we conclude that the members of the Board are entitled to legislative immunity in their *individual* capacities. *See id.* As noted above, the Board members did not need to be members of the legislature in order to enjoy legislative immunity. *Id.* The teachers, however, have argued that even if we find the actions of the Board to be legislative in nature, Dillon's Rule should prevent application of legislative immunity in this case. Even if the Board did not have the power to abolish the alternative school under Tennessee law, the Board members may still enjoy legislative immunity as individuals in federal court for their legislative actions, sound or unsound. *See R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 438 (6th Cir. 2005) (citing *Shoultes v. Laidlaw*, 886 F.2d 114, 117 (6th Cir. 1989) for the proposition that even if an ordinance is held to be invalid, officials acting in their legislative capacities are absolutely immune from suit). Legislative immunity exists so that individuals can feel more comfortable volunteering to perform public-service functions, such as serving on their local school board. Because "the threat of liability may significantly deter service in local government, where prestige and pecuniary rewards may pale in comparison to the threat of civil liability," *Bogan*, 523 U.S. at 52 (citation omitted), legislative immunity continues to play an important role. Therefore, we hold that the Board members may be sued in their official capacities, but may not be sued as individuals for money damages, or declaratory or injunctive relief. Because the Board members are entitled to

---

[9]"'Dillon's Rule' originated with John F. Dillon, former Chief Justice of the Supreme Court of Iowa and former circuit judge for The United States Eighth Judicial Circuit." *Williams v. Town of Hilton Head Island*, 429 S.E. 2d 802, 804 n.1 (S.C. 1993) (citing John F. Dillon, Commentaries on the Law of Municipal Corporations (5th ed.), § 237, p. 448 (1911)). The state of Tennessee uses Dillon's Rule as a canon of statutory construction when determining the authority of a municipality. *Arnwine v. Union County Bd. of Educ.*, 120 SW. 3d 804, 807 (Tenn. 2003). Under Dillon's Rule, a municipal government has "authority to act only when

> (1) the power is granted in the "express words" of the statute, private act, or charter creating the municipal corporation; (2) the power is "necessarily or fairly implied in, or incident to[,] the powers expressly granted"; or (3) the power is one that is neither expressly granted nor fairly implied from the express grants of power, but is otherwise implied as "essential to the declared objects and purposes of the corporation."

*Id.* at 807-08 (internal quotation marks omitted).

legislative immunity with respect to the claims made against them in their individual capacities, we need not address qualified immunity, which also is a doctrine applicable only in the context of individual capacity suits.

### III. CONCLUSION

As a threshold matter, we **REVERSE** the district court's holdings regarding standing; we hold that all of the teachers have standing to bring suit as individuals and Forgety and Kucera have standing to bring suit as municipal taxpayers. The record demonstrates that the teachers were injured by the loss of their jobs, that this loss was caused by the Board's decision to abolish the alternative school at which they worked, and that monetary compensation could redress this injury. In addition, the record demonstrates that Forgety and Kucera qualify as municipal taxpayers capable of bringing suit to prevent misuse of their tax dollars.

Viewing the facts in the light most favorable to the Board, we hold that there is a genuine issue of material fact as to whether Kingswood's programs for the alternative-school students violated the Establishment Clause of the United States Constitution. Therefore, we **REMAND** the case to the district court for further proceedings consistent with this opinion.

Because we hold that the Board was performing a legislative function when it abolished the alternative school, we **AFFIRM** the district court's grant of summary judgment to the Board on the teachers' procedural-due-process claim. In addition, because we hold that the Establishment Clause claim adequately addresses the alleged substantive-due-process violation, we **AFFIRM** the district court's dismissal of this claim.

As to the Board members' legislative and qualified-immunity defenses, we **REVERSE** the district court's determination that the issue of whether the Board members qualify for these protections is moot. We hold that the Board members are entitled to legislative immunity on the individual-capacity claims because their decisions about the budget were legislative in nature. Because we conclude that legislative immunity applies to the individual-capacity claims against the named Board members, we do not analyze whether the Board members are entitled to qualified immunity.

---

**DISSENT**

---

ROGERS, Circuit Judge, dissenting. Because plaintiffs are without standing to assert a claim under the Establishment Clause, I would affirm the judgment below. Plaintiffs as employees have not shown that they suffered an injury protected by the Establishment Clause; as municipal taxpayers, they have not shown an injury-in-fact. It is therefore not necessary for us to reach a difficult Establishment Clause issue, and not proper in this case for us to constitute the district court as a supervisory board to review the local school's policies in that regard. While the majority properly resolves the due process and immunity issues presented on this appeal, I respectfully disagree with Part II.B dealing with the Establishment Clause.

**A.  Standing as Employees**

First, although plaintiffs as employees appear to meet the minimum Article III requirement of injury in fact, they do not have prudential standing to bring an Establishment Clause claim. This is because the injuries that they suffered when their positions were eliminated are not of the type that the Establishment Clause protects. Plaintiffs must establish that the rights or interests that they assert are theirs and not those of others not party to the proceedings. *Warth v. Seldin*, 422 U.S. 490, 499-500 (1975); *see also Powers v. Ohio*, 499 U.S. 400, 410, (1991); *U.S. Dep't. of Labor v. Triplett*, 494 U.S. 715, 720 (1990); *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 954-55 (1984); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982); *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 100 (1979); *Barrows v. Jackson*, 346 U.S. 249, 255 (1953). This prudential rule was recently applied by the Supreme Court in *Kowalski v. Tesmer*, 543 U.S. 125 (2004):

> We have adhered to the rule that a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." This rule . . . represents a "healthy concern that if the claim is brought by someone other than one at whom the constitutional protection is aimed," the courts might be "called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights."

*Id.* at 129 (citations omitted).

Plaintiffs doubtless were injured when the Board decided to eliminate the alternative school for budgetary reasons. Because of that decision, plaintiffs lost their positions and were forced to either accept different positions within the Jefferson County school district or to look elsewhere for employment. Even if we assume that this injury satisfies Article III requirements, *see Ruhrgas AG v. Marathon Oil Co.*, 526 U.S., 574, 585 (1999), the parties do not have prudential standing because these injuries simply do not fall within the protection of the Establishment Clause. *Kowalski*, 543 U.S. at 129 & n.2.

The Establishment Clause protects citizens from injuries resulting from government endorsement of religion. *See Edwards v. Aguillard*, 482 U.S. 578, 587 (1987). In the present context, the persons at whom the constitutional protection is aimed are clearly teachers, students, or parents who are forced by the state to interact with a religion at their schools. Plaintiffs as employees in this case have not alleged such harm, or anything like it. They do not, for instance, claim that they were forced into contact with religion as a result of their positions being eliminated.

*See Doe v. Porter*, 370 F.3d 558, 561 (6th Cir. 2004) (parents of children attending public school where Bible Education Ministry was being conducted had standing to bring an Establishment Clause claim). Indeed, plaintiffs' primary complaint is that they are no longer associated with the administration of the alternative program. Their Establishment Clause claim patently asserts the injury of others, stating that "[t]he placement of students into such a religiously oriented school with teachers who are employed and solely answerable to Kingswood cannot be said to be generated by some secular purpose."[1] This is exactly the type of claim that the third-party standing doctrine does not allow plaintiffs to bring.

While prudential, third-party standing analysis requires an understanding of the claims raised by the plaintiffs, it is not a merits determination. For instance, in this case, I take no position on whether there has been a First Amendment violation. The point is that even if there has been such a violation, the persons whose interests are protected by the First Amendment are not the persons suing. As we explained in *Dismas Charities, Inc. v. United States Department of Justice*, 401 F.3d 666, 674 (6th Cir. 2005), "the prudential standing inquiry requires a clear identification of the relevant provision that is the basis for the lawsuit." The analysis is no more a merits analysis than the Supreme Court's analysis in *Kowalski*. In that case criminal appeals attorneys as party plaintiffs challenged a Michigan law that infringed on the procedural rights of criminal defendants to the appointment of an attorney on appeal. *Kowalski*, 543 U.S. at 127-29. To resolve whether the plaintiff attorneys lacked prudential standing, the Court of course had to understand the nature of the constitutional challenge so as to determine whether the constitutional provision protected the plaintiffs. *See, e.g.*, *id.* at 132. But the merits issue (whether the Michigan law violated due process) was not decided at that time. *Id.* at 134. In short, reasoning that the employees in this case are not protected by the Establishment Clause no more touches the merits than the Supreme Court's reasoning in third-party standing cases such as *Kowalski*.

Furthermore, no arguable exception to the prohibition against third-party standing applies here. The third parties injured by this alleged Constitutional violation are not unable or unlikely to assert their rights themselves. *E.g., Barrows v. Jackson*, 346 U.S. 249, 257 (1953); *see also Eisenstadt v. Baird*, 405 U.S. 438, 446 (1972). The students who attend the Kingswood school and their parents are able to sue should they desire. Nor is there a close relationship between the advocate and the third party. *See*, *e.g.*, *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925). These teachers no longer work at this school and have no connection to the students whose rights they are asserting. Finally, this is not a case that involves an allegedly overbroad statute.

Moreover, cases applying the "zone of interest" test are not applicable. The zone of interest test results from a statutory loosening of prudential third-party standing rules, a statutory loosening that is not present here.

Of course, prudential standing requirements by their very prudential nature can be loosened or done away with by Congress. *E.g.*, *Bennett v. Spear*, 520 U.S. 154, 162-66 (1997). It was such a statutory loosening that the Supreme Court inferred in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150 (1970), the case in which the zone of interest test was born. The Supreme Court held that Congress in passing the Administrative Procedure Act loosened third-party standing so as to permit judicial review of federal agency action when the plaintiff was "arguably" within the "zone of interest" of the federal statute that was the basis for claiming that the agency had erred. *Id.* at 153-54; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) ("We have long since rejected [the] interpretation . . . which would have made the judicial review provision of the APA no more than a restatement of pre-existing law. Rather we have said that to

---

[1]Because an understanding of the nature of plaintiffs' claims is necessary to conduct a third-party standing analysis, it is of course proper to look at the merits portion of the teachers' brief for that purpose.

be 'adversely affected or aggrieved . . . within the meaning' of a statute, the plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis of his complaint." (citation omitted)); *Dismas Charities, Inc.*, 401 F.3d at 674.  This case is of course not an APA case, and the zone of interest test is not applicable.[2]

## B.  Standing as Taxpayers

Plaintiffs also do not have standing to bring an Establishment Clause challenge as taxpayers of Jefferson County.  Although standing requirements for municipal taxpayers are less demanding than those for state or federal taxpayers, *see Taub v. Kentucky*, 842 F.2d 912, 918 (6th Cir. 1988), they are not so lax as to allow taxpayers to challenge every decision that a municipality makes.  A taxpayer must still show that the challenged municipal action depleted the municipal fisc such that he could at least in theory be subject to increased taxation.  It is true that the Supreme Court stated in *Frothingham v. Mellon*, 262 U.S. 447, 486 (1923), that a "remedy by injunction to prevent the[] misuse [of municipal funds] is not inappropriate."  Subsequent decisions of the Supreme Court and this court — in Establishment Clause cases at that — make clear that the *Frothingham* language refers to misuse that results in a loss to the public fisc that might affect how much taxpayers pay.  In a case involving Bible-reading in the public schools, the Supreme Court quoted the *Frothingham* language but still required at least a diminution of public funds:

> [Frothingham] recognized . . . that "[t]he interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate."  Indeed, a number of states provide for it by statute or decisional law and such causes have been entertained in federal courts. Without disparaging the availability of the remedy by taxpayer's action to restrain unconstitutional acts which result in direct pecuniary injury, we reiterate what the Court said of a federal statute as equally true when a state Act is assailed: "The party who invokes the power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally."

> It is true that this Court found a justiciable controversy in *Everson v. Board of Education*, 330 U.S. 1[(1947), a suit by a district taxpayer against a township board of education].  But Everson showed a measurable appropriation or disbursement of school-district funds occasioned solely by the activities complained of.  This complaint does not. . . .

---

[2] It is true that when the zone of interest test does apply, it is a prudential standing doctrine.  But it is a misreading of *Elk Grove Unified School District v. Newdow*, 542 U.S. 1 (2004), to treat the zone of interest test as the first step of a general prudential-standing three-part test.  Instead *Elk Grove* merely lists the zone of interest test as one type of requirement "encompasse[d]" by prudential standing. 542 U.S. at 12.  Similarly, the mention of zone of interest in dictum in *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982), is part of a general preliminary overview unrelated to the issues presented in that case.  Indeed, we recognized in *Club Italia Soccer & Sports Organization, Inc. v. Charter Township of Shelby, Michigan*, 470 F.3d. 286, 292 (6th Cir. 2006), that the Supreme Court has applied the test "almost exclusively" to APA cases.

As recognized in *Club Italia*, however, it is true that the phrase "zone of interest" has been used in a few non-APA contexts, such as some Dormant Commerce Clause cases.  Such cases do not warrant setting up the zone of interest test as part of a generally applicable three-prong test for prudential standing.  Indeed, such a construct would be incoherent, as any plaintiffs meeting the second prong, that the plaintiffs must assert their own legal rights and interests, would automatically meet the first prong, that plaintiffs be within the zone of interests.  In *Club Italia* itself, while we termed the prudential test we applied (to a Due Process and Equal Protection challenge) a "zone of interest" test, we made clear that the test so applied was stricter than the zone of interest test that applies in an APA context. *Id.* at 293-94.

[B]ecause our own jurisdiction is cast in terms of "case or controversy," we cannot accept as the basis for review, nor as the basis for conclusive disposition of an issue of federal law without review, any procedure which does not constitute such.

The taxpayer's action can meet this test, but only when it is a good-faith pocketbook action. It is apparent that the grievance which it is sought to litigate here is not a direct dollars-and-cents injury but is a religious difference. If appellants established the requisite special injury necessary to a taxpayer's case or controversy, it would not matter that their dominant inducement to action was more religious than mercenary. It is not a question of motivation but of possession of the requisite financial interest that is, or is threatened to be, injured by the unconstitutional conduct. We find no such direct and particular financial interest here. If the Act may give rise to a legal case or controversy on some behalf, the appellants cannot obtain a decision from this Court by a feigned issue of taxation.

*Doremus v. Bd. of Educ.*, 342 U.S. 429, 433-35 (1952) (citations omitted).

This court ruled similarly in a case that even more clearly applies to municipal taxpayer standing. *Hawley v. City of Cleveland*, 773 F.2d 736, 737-38 (6th Cir. 1985), was an action challenging a lease of airport space for use as a chapel. We held that users of the airport had standing because they would have to use different concourses or stairways to avoid "unwelcome religious exercises." *Id.* at 740 (citation omitted). But the standing of Cleveland *taxpayers* depended on "whether the rental of the space for the chapel to the diocese at the agreed-upon price could harm Cleveland's fisc," and we remanded for a determination of that issue. *Id.* at 742. In doing so, we cited the very language of *Frothingham* referred to above regarding "misuse," summarized more recent cases including *Doremus*, and concluded that "the Supreme Court continues to allow suits by nonfederal taxpayers to enjoin unconstitutional acts *affecting public finances.*" *Id*. (emphasis added); *see also Steele v. Indus. Dev. Bd.*, No. 93-5350, 1994 WL 599458, at *1 (6th Cir. Nov. 1, 1994) (issuance of tax-exempt bonds to a sectarian university). Here, in contrast to the situation in *Hawley* where the facts were not clear, it is undisputed that the elimination of the alternative school and the delegation to Kingswood was a cost-saving measure. Because the Board had an obligation under state law to provide an alternative program, the delegation was not an additional expenditure, but instead reduced the financial burden on Jefferson County and its taxpayers. There is no need to defend the public treasury because Jefferson County, and thus its taxpayers, have saved money as a result of the delegation. Notably, plaintiffs do not point to any cases where municipal taxpayers have been permitted to challenge government conduct from which they stood to experience financial gain.

In such a situation, a taxpayer asserts nothing more than a claim that the municipality must follow the law. The Supreme Court, however, has repeatedly held that "Art. III requirements of standing are not satisfied by 'the abstract injury in nonobservance of the Constitution asserted by . . . citizens.'" *Valley Forge*, 454 U.S. at 482 (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 223 n.13 (1974)).

Finally, requiring municipal taxpayers to establish at least some diminution of the public fisc does not ignore the distinction between municipal taxpayers and state and federal taxpayers. For federal and state taxpayers to have standing, they must show *more* than just government action that depletes the treasury and thus creates the possibility of future taxation. *See, e.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345-46 (2006). This is because the interests of federal and state taxpayers in their respective federal and state treasuries "[are] shared with millions of others; [are] comparatively minute and indeterminable; and the effect upon future taxation . . . so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventative powers of a court of equity." *Id.* at 333 *(quoting Frothingham*, 262 U.S. at 486-87); see also *id.* at 345. Municipal

taxpayers, on the other hand, have been held to possess a much more direct interest in the municipal treasury.  Because municipal taxpayers are theoretically fewer in number, they have a more direct relationship with their local government such that a direct injury is presumed *when the municipal fisc is depleted.  Taub*, 842 F.2d at 918.

Indeed, the District of Columbia Circuit reasoned—in a case relied upon by the majority here—that "[a]lthough *Doremus* involved only state taxpayers, the pocketbook injury requirement also applies to municipal taxpayers, as *Doremus*' reference to *Frothingham* makes clear."  *D.C. Common Cause v. District of Columbia*, 858 F.2d 1, 4 (D.C. Cir. 1988).  The D.C. Circuit ruled in that case that even though municipal taxpayers need not "demonstrate that their taxes will be reduced as a result of a favorable judgment," they must still show that "the challenged program involves a measurable appropriation of public funds."  858 F.2d at 5.  The D.C. Circuit cited our *Hawley* case, among other authorities.  *Id.*  In short, without at least a demonstration of a reduction of the public fisc from the challenged action, municipal taxpayers lack Article III standing.

The federal courts have jurisdiction only when plaintiffs will get something by winning beyond the satisfaction that the government is complying with the law, and (absent congressional grants of standing) only when the plaintiffs rely upon legal principles that protect their interests. These fundamental principles keep the courts from constituting themselves as supervising review boards to decide in the abstract the constitutionality of all government actions.  Under these principles, plaintiffs lack standing either as employees or as municipal taxpayers.  We therefore do not have jurisdiction to address the substantive Establishment Clause issues in this case, and I would not do so.